(No. 13496.—Rule discharged.)

THE PEOPLE ex rel. The Peoria Bar Association, Relator,
vs. JAMES F. LASLEY, Respondent.

*Opinion filed April 19, 1922.*

DISBARMENT—*fraudulent and dishonest motives must be proved
to warrant disbarment.* The power of the Supreme Court to dis-
bar an attorney is to be used in moderation and only on clear
proof, and not only must the acts of misconduct charged be proved,
but fraudulent or dishonest motives also must be satisfactorily
established.

STONE, C. J., took no part.

INFORMATION to disbar.

W. G. McROBERTS, for relator.

NATHAN H. WEISS, and SCHOLES & PRATT, for re-
spondent.

Mr. JUSTICE FARMER delivered the opinion of the court:

This is an information filed on the relation of the
Peoria Bar Association for the disbarment of James F. Las-
ley. The cause was referred to a commissioner, who took
testimony and first reported that sufficient of the charges
contained in the first and second counts was proven to jus-
tify the disbarment of respondent and he so recommended.
On the hearing of objections to his report the commissioner
modified it by recommending suspension for one year and
until the further order of this court. The relator has filed
no objections or exceptions to the commissioner's report.
Respondent was admitted to the bar in October, 1915.

The first count alleged, in substance, that Michael Haus-
ner employed respondent in December, 1918, to collect for
him $69.63 he claimed was due him from Rose Churlones,
a prostitute. At the time of the employment Hausner paid

respondent $10 on account and the following day paid him $190 additional. The count avers the money was paid respondent to be used in procuring an indictment against Rose Churlones and Clyde Capron, who was connected with the Federal bureau of investigation, for violation of vice-zone regulations; that the $190 was paid respondent at his suggestion and on his promise to re-pay it out of what he would get out of Capron; that about January 7, 1919, Hausner demanded the return of the $200 he had paid respondent but the demand was refused, and thereafter the respondent sought to learn of the Department of Justice if it did not have some charges against Hausner upon which he might be indicted. The count charges the $190 was not received by respondent for any lawful purpose, that he rendered no lawful services therefor, and that his plan was to extort money from Capron in disregard of law.

The second count alleges Hyman D. Wolcott, husband of respondent's wife's mother, on account of trouble with his wife left his home about March 2, 1916; that respondent was employed by Wolcott as his attorney to effect a settlement and an agreement was made between them as to respondent's fees. A settlement was effected between Wolcott and his wife of their property interests by respondent and he received $571.46 fees. As a part of the settlement Mrs. Wolcott gave her note to her husband, dated in March, 1916, for $300, due one year from date. The count alleges Wolcott indorsed and delivered the note to respondent to be negotiated, which was done, and that respondent kept the proceeds. The count charges unprofessional and dishonorable conduct of respondent toward his client with reference to other matters than the note, but the commissioner finds, and we think the finding amply warranted, that as to those matters the charges are not sustained, and we need not further refer to them.

The third count alleges respondent's general reputation for moral character, truth and veracity and for fair dealing

and professional honesty as a lawyer is bad. The commissioner found, and the evidence abundantly warranted the finding, that this count was not sustained by the proof.

There is no dispute that Hausner went to respondent's office in December, 1918, and retained him to perform services for him. Hausner is a barber and had an infatuation for Rose Churlones, a prostitute. Apparently becoming disillusioned, he employed respondent to recover from the woman $69 of Hausner's money he claimed she had. Respondent gave Hausner a receipt for the money on account. The next day Hausner paid respondent $190, and claimed, and the first count charges in substance, that this money was paid respondent for the purpose of securing an indictment against Capron and the woman and blackmailing Capron; that respondent promised to pay the money back to Hausner. Hausner testified that he wanted the woman indicted and sent to jail; that he believed Capron was protecting her; that he had seen Capron in her room and she had Capron's card. He further testified respondent told him it would cost $200 to procure an indictment against them and he paid him the $190 additional. He told the respondent he wanted the woman and Capron indicted; that the woman should be indicted for violating the Federal vice law and Capron for protecting her. He further testified respondent was requested to procure Hausner's picture, which the woman had. He later stated he wished to add to his testimony before given, that the second time he was in respondent's office respondent said Capron had plenty of money; that he wanted to indict him, get about $5000 out of him, and they would divide it. Hausner had previously sought to employ another attorney, who was unable to take care of the matter for him, and he then employed respondent. Hausner's testimony that it was respondent who suggested the indictment of Capron and that the $190 was paid for that purpose was flatly contradicted by respondent, who testified at great length about his employ-

ment by Hausner and the services performed under that employment. In January, 1919, Hausner demanded his money back from respondent, who refused to pay it, and thereafter Hausner made complaint to the grievance committee. Capron testified respondent talked to him at different times before and after Hausner made his complaint and said he had rendered services for Hausner; that Hausner wanted back the money he had paid respondent, and inquired of the witness if he had any evidence on which Hausner could be indicted.

The proof shows that Hausner is of German parentage and there were reports in the community that he was suspected of disloyalty to this country while we were at war with Germany. It would seem that Rose Churlones had said she found a picture of the Kaiser in Hausner's trunk. He testified that was untrue but admitted he did have the Kaiser's picture in his trunk. The fact of his having the picture appears to have been reported in the community and caused a good deal of talk. Respondent testified Hausner feared he might be indicted, and in the course of his services for him he interviewed Capron and inquired if there was any probability of an indictment and was told there was not. Respondent testified Capron told him he had employed Rose Churlones to get evidence of the reports of Hausner's disloyalty, and Capron did not deny that. Respondent also testified he conferred with the assistant district attorney for the purpose of ascertaining if there was any danger of Hausner's indictment. He made inquiries for information about the matter of the deputy United States marshal at the Federal building in Peoria and made one trip to Springfield in connection with that matter. He denied that he talked with Capron·or anyone else for the purpose of having Hausner indicted, but stated all his inquiries were made for the purpose of ascertaining whether there was danger of an indictment. He testified there were rumors of several other acts of disloyalty

of Hausner in the neighborhood which were of a character that might cause action by the Federal government. Respondent testified the deputy United States marshal told him it had been reported that Hausner had torn down and trampled on the American flag, and this was not contradicted. It would therefore seem Hausner might well have fears of the Federal authorities.

The commissioner found suit was instituted for Hausner against Rose Churlones in a justice's court to recover the $69. That suit never went to trial. A replevin suit was begun against the woman to obtain Hausner's photograph. He was given his photograph, and the case was not tried but was dismissed and Hausner paid the costs. The payment of the costs greatly offended Hausner at respondent, and Hausner claimed the costs should be paid out of the $200 he had given respondent. Hausner also wanted Rose Churlones arrested and put under a peace bond for threatening him with a revolver, and respondent went with him to a justice's court to procure a warrant but the justice refused to issue it.

The commissioner finds that the services rendered for Hausner were worth considerably more than $10, and that Hausner was not entitled to the $190 back unless respondent expressly agreed to give it back to him. The commissioner further finds that respondent claimed to Hausner that he had kept him out of jail but had done nothing more than to inquire of Capron if there was any likelihood of Hausner being indicted and was told there was not. The commissioner concludes that respondent obtained money from Hausner part of which was for an unlawful purpose, and that while he did not promise to pay the money back he led Hausner to believe he would get it for him out of Capron, and that when Hausner fell out with respondent and demanded the money, respondent sought to find if he could obtain evidence against Hausner upon which he might be indicted.

The only proof that contradicts the testimony of respondent, except Hausner's testimony, that in his interviews with the Federal authorities he was not trying to secure Hausner's indictment but was endeavoring to protect him by ascertaining whether there was danger of it, was the testimony of Capron. He testified respondent said Hausner was trying to cause him some trouble; that Hausner was demanding back the money respondent had received for the services rendered; that Hausner would behave if indicted, and he wanted to know if there was any evidence upon which that could be done. He did not testify that respondent gave him any evidence or information or offered to give him any for the purpose of procuring an indictment. Two assistant United States district attorneys and a deputy United States marshal, with whom respondent testified he conferred to ascertain whether there was any probability of an indictment, were not called to testify on the hearing. We would not be justified in disregarding Hausner's testimony, but there is an abundance in it upon which we would greatly hesitate to base a judgment without his testimony being corroborated.

In his testimony respondent admitted Wolcott gave him the $300 note to sell. He testified he tried to negotiate it to two banks and to another party but they would not buy it. Being unable to sell the note he told Wolcott he was indebted to his brother-in-law, who would take the note and give him (respondent) credit for it; that he would pay Wolcott part of the note during the year 1916 and the balance when the note was due. Wolcott agreed to this and respondent delivered the note to his brother-in-law. Afterwards, during the year 1916, respondent paid Wolcott two fifty-dollar payments on the note and took his receipt for them. Wolcott afterwards became unfriendly to respondent and employed an attorney to get the money he claimed respondent owed him. Respondent testified that on learning of Wolcott's attitude he offered to pay the balance of the

note before it was due, but Wolcott said he did not need the money and refused to accept it. After Wolcott had employed an attorney, respondent and said attorney went over the whole matter and made a settlement, and respondent executed three notes, payable to Wolcott in one, two and three years, for $77 each. Afterwards Wolcott made complaint to the grievance committee of the Peoria Bar Association. After the unfriendly attitude of Wolcott toward respondent occurred respondent gave the money to his brother-in-law, Hovenden, who was also a son-in-law of Wolcott, to pay off the notes. Hovenden testified he offered to pay them several times, both before and after this proceeding was begun, but that Wolcott refused to accept the money, called respondent a vulgar name and said he wanted to disbar him. After repeated refusals of Wolcott to accept the money respondent deposited it with the attorney who represented him on the hearing before the grievance committee, for payment to Wolcott. Respondent's attorney testified he had the money to pay the notes, which respondent had given him, and told the grievance committee he had it but did not like to pay it over without the approval of the committee. Wolcott himself admitted Hovenden had offered to pay him the money several times but claimed there was always "a string behind it," which Hovenden denied, and he admitted Hovenden told him at another time that respondent's attorney had the money to pay him. Without going further into the testimony on this subject we think it clearly insufficient to establish the charge and warrant either disbarment or suspension. Up to the time the $300 note was disposed of by respondent his relations with Wolcott were of the most friendly character. The commissioner finds respondent rendered good service for Wolcott in making the settlement with his wife. He further finds the proof shows Wolcott is a moron, that he is afflicted with a venereal disease, and is of an ex-

tremely changeable and suspicious disposition. Wolcott testified he had not been feeling well in mind or body and that he was under the care of doctors. There is really no corroboration of Wolcott in any important particular, while respondent was corroborated.

Relator offered proof of misconduct of the respondent before his admission to the bar, but the commissioner reported he did not consider that testimony. At the time the charges were preferred before the grievance committee and the hearing had the respondent resided with his family in Peoria. The report of the grievance committee recommending disbarment proceedings was made in January, 1920, but the information was not filed until June of that year. Respondent testified he decided to move to California, and in May, 1919, sold his house for that purpose. He remained in Peoria for several months on account of the complaints against him; that several lawyers told him no suit to disbar him had been instituted and it would be all right for him to move, and that he did move to California some time before the information was filed and is now residing in that State.

We have not overlooked testimony not referred to in this opinion, but refrain from setting it out and commenting on it for the reason that the testimony we have referred to is that on which the commissioner based his report and is the only evidence necessary to be considered. If what we have referred to is not sufficient to justify disbarment or suspension the charges are not sustained. We shall not indulge in lengthy comment in stating our conclusions. The rules of law governing cases of this character are well settled and well understood by the profession. The power of the court to disbar an attorney is to be used in moderation and only on clear proof. Not only must the acts of misconduct charged be proved, but fraudulent or dishonest motives must also be satisfactorily proved. 6 Corpus Juris, 581, 582, *People* v. *Amos, 246 Ill. 299, People* v. *Thorn-*

*ton,* 228 id. 42, *People* v. *Barker,* 56 id. 299, and *People* v. *Olson,* 258 id. 283, where many other cases are cited.

There are in the testimony of both Hausner and Wolcott inconsistencies and contradictions which so impair its trustworthiness that without more corroboration than is found in the record it clearly is insufficient to warrant us in holding the charges were proved. Any further comment we might make on evidence not herein referred to' would only serve to emphasize what we are convinced is the correctness of our conclusion that disbarment or suspension of respondent is not warranted by the proof.

The rule is discharged.     *Rule discharged.*

Mr. CHIEF JUSTICE STONE took no part in this decision.

---

(No. 14374.—Reversed and remanded.)
THE COLUMBIAN CIRCLE *vs.* MARGARET AUSLANDER, Appellant.—(ESTELLE B. SCHRAMM *et al.* Appellees.)

*Opinion filed April 19, 1922.*